IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESLEE SCALLON, a California resident, and JAY GAIRSON, a Washington resident, Individually and Derivatively on Behalf of HENRY ENTERPRISES INC.

        Plaintiffs,

    v.

SCOTT HENRY'S WINERY CORP., an Oregon corporation, et al.,

        Defendants,

    and

HENRY ENTERPRISES, INC., an Oregon Corporation,

        Nominal Defendant.

Case No. 6:14-cv-1990-MC

OPINION AND ORDER

_____

MCSHANE, Judge:

    Defendant Henry Enterprises, Inc (HEI), is a closely held corporation that manages over 3,300 acres of timber, ranch, and farmland in the Umpqua Valley here in Oregon. It is a family-run and family-owned organization that, by the account of all parties, had been managed for

1 – OPINION AND ORDER

much of its history by its patriarch, Defendant Calvin "Scott" Henry (Scott Henry). His management of the corporation, including personal loans he obtained from HEI for the building of an extensive winery on HEI property, is the subject of this litigation.

The litigation arises from a shareholder derivative action brought by Plaintiffs Leslee Scallon and Jay Gairson on behalf of nominal defendant HEI. Plaintiffs allege that the named Defendants were using corporate funds and property for their own benefit and to the detriment of other shareholders. Rather than defend, HEI filed an election to purchase all of plaintiff's shares pursuant to Or.Rev.Stat. 60.952(6). The value of those shares is, after seven years of litigation, now before the court following a three-day bench trial that commenced on January 25, 2022.

The bulk of Plaintiffs' claims revolve around the substantial debt owed by the Scott Henry Defendants to HEI. While all parties agree that Scott Henry was a dedicated manager of the ranch property, it was apparent at trial that he also spent HEI money to develop a vineyard and winery on the family land. The winery and his daughter, Synthia Beavers, benefited from the personal endeavors of Scott Henry.[1] While it is relatively easy to assess the value of the hard corporate assets, a lack of records and clear communication made it harder to determine the amount of debt owed by the Scott Henry Defendants, the appropriate amount of rent owed for the use of the winery property, and whether the debt and rent were ever intended to be actually paid to the corporation. In pretrial briefings, the Scott Henry Defendants maintained that "Rarely did Scott Henry's parents and sibling expect that these funds should ever be repaid; most of these

---

[1] Synthia Beavers holds a power of attorney for her father, Scott Henry. Scott Henry has dementia. The Court refers to Scott Henry, Synthia Beavers, and Scott Henry's Winery Corp. as the "Scott Henry Defendants" as their interests appear to be one and the same. Additionally, as outlined below, the interests of the Scott Henry Defendants are now adverse to not only the Plaintiffs' interests, but those of the other Defendants and HEI itself.

2 – OPINION AND ORDER

exchanges were never documented as loans or notes." Def. Scott Henry's Winery Corp, Calvin Henry II, and Synthia Beavers Trial Memo, page 3.

At trial and despite the prior position taken in their own Trial Memo by the Scott Henry Defendants, it was surprising to learn that Defendant Synthia Beavers generally agreed with the amount of the debt as determined by certified public accountant Amy Mauss. With even Synthia Beavers agreeing on (1) the amount of the debt and the interest (both of which are on HEI's tax returns that Synthia Beavers signed); and (2) HEI's valuation as of December 2014 as determined by the Court-appointed neutral appraiser,[2] one would think that there is not much else in dispute with respect to determining the fair value of Plaintiffs' shares. If so, one would be mistaken.

The buyout statute confers broad equitable powers upon the Court to "determine the fair value and terms of purchase of the shares[.]" ORS 60.952(6)(f). The statute directs the Court to "tak[e] into account any impact on the value of the shares resulting from the actions" in the underlying complaint. ORS 60.952(5)(a)(A). As the Court noted in earlier opinions, the statute essentially gives the Court unfettered discretion in fashioning an equitable remedy.

This is not the standard buyout case where the Court would order, say, one bad actor to buyout a minority shareholder, taking into consideration any bad acts in adjusting the purchase price. That is not possible in this situation, in large part because Scott Henry will not be the only remaining shareholder. As noted above, in this case, there exists a second batch of Defendants (the "Passive Defendants"). While the Passive Defendants chose not to join Plaintiffs' derivative action, they will of course be impacted by any fair value determination. In recent filings, these

---

[2] Mr. Gadawski valued HEI at $6,622.058. This valuation did not take into account any "disputed" assets, discussed below. All parties agree with Mr. Gadawski's valuation, with the exception of Plaintiffs, who disagree only with Mr. Gadawski's application of a built-in-gains discount, discussed below.

3 – OPINION AND ORDER

Defendants essentially agree with Plaintiffs' allegations regarding the actions of Scott Henry. Additionally, the Passive Defendants argue that until an about-face late in the litigation, the Scott Henry Defendants assured all parties that they owed debts and that the debts would be repaid.

The evidence of the Scott Henry Defendants' late-breaking amnesia with regard to their promise to pay their debts is overwhelming. Synthia Beavers testified unequivocally "And I've always said I'd never—dad owes a debt. We've never said no." ECF No. 201, Tr. 156. Sherry Kearney testified that Synthia Beavers always represented the debt would be repaid. ECF No. 200, Tr. 191. Scott Henry told Christina Kruse that HEI would use the same process used to settle Christina's father's debt to settle his own debt. ECF No. 200, Tr. 112. Corporate minutes indicated HEI would purchase Scott's shares to resolve his debt. ECF No. 200, Tr. 113. Phil Scallon testified Lura Scallon, Scott's sister, "always assumed that Scott would take care of his debt." ECF No. 200, Tr. 78.

The Court finds that Scott Henry and Synthia Beavers simply attempted to put off resolving the debt. This delay went on for years. At trial, the evidence on this issue was undisputed. Christina Kruse joined HEI's board in 2001. ECF No. 200, Tr. 127. Christina Kruse testified that her entire time on the board, from 2001 to 2014, "has always been around resolving this debt with Scott, the winery, and all the comingling that's happened." ECF No. 200, Tr. 152. The board and other shareholders kept waiting for Scott Henry or Synthia Beavers to resolve the debt or, at worst, finally provide a final number of the amount of Scott Henry's debt. ECF No. 200, Tr. 152. However, "[i]t never happened."[3] ECF No. 200, Tr. 36.

---

[3] In the Court's view, the Scott Henry Defendants' constant kicking of the debt can down the road forced Plaintiffs, and eventually the Passive Defendants, into demanding the Court make Scott Henry finally settle his outstanding debts. After years of the Scott Henry Defendants delaying even arriving at a firm number for the debt, the other shareholders had to turn to a third party. Scott Henry's reluctance was likely due simply to the size of the debt he racked up. But simply because the debt has ballooned to a massive amount does not mean it is unfair that Scott

4 – OPINION AND ORDER

In September 2020, now represented by new (and current) counsel, the Scott Henry Defendants for the first time argued, in a letter to Mr. Gadawski, that the evaluator should not consider any of Scott's "disputed" debts in his appraisal. ECF No. 193, Ex. 1. For various reasons—i.e., statutes of limitations, laches, unclean hands, or even that the "loans" were actually unreported wages for work on the property—the Scott Henry Defendants then argued any debts, to the extent any existed in the first place, were uncollectable and had no value to HEI.

This new position taken by the Scott Henry Defendants, understandably was "a shocking game changer" to those shareholders who believed Scott Henry intended to make good on his extensive debt to the corporation. *See* Sherry Kearney Testimony, ECF No. 200, Tr. 192. Remarkably, however, it is the Scott Henry Defendants that argue in their post-trial brief that they are shocked, surprised, and prejudiced that the other parties (Plaintiffs, HEI, and the Passive Defendants) seek to have Scott Henry repay his debts. In the Court's view, what happened is clear. Scott Henry viewed HEI as his own corporation and—due to his years of work on the property along with his complete, unchecked control over HEI's finances and operations—felt that he could take whatever he wanted from HEI whenever he wanted it. Although Scott Henry may have had intentions of someday making good on the debt, he was likely shocked when, after forty years, his debt had ballooned to nearly $1,500,000. He was also likely surprised at the fair market value of rent for the winery and vineyard, land he used for his own benefit without providing a dime to HEI.

---

Henry must settle it. Likewise, that settling the debt may result in Scott Henry losing his winery, or even losing any interest in HEI going forward, is not inequitable. What the Court views as settling up a largely undisputed debt the Scott Henry Defendants view as "going after the [Scott Henry] Defendants with vengeance." ECF No. 207, 6.

5 – OPINION AND ORDER

Ms. Beavers testified at trial that she and her father always acknowledged the debt. She appeared unaware at trial, however, that her attorney took the opposite position in the September 2020 letter to Mr. Gadawski. Additionally, at her deposition in December 2021, Synthia Beavers stated her belief that neither Scott nor the winery currently owed any debt to HEI. ECF No. 201, Tr. 189. The Court finds that Scott Henry and Synthia Beavers' motivation in this action was not to settle up acknowledged debts, but instead to find some way to keep "the land under the winery if we can." ECF No. 201, 143. This complicated the litigation and resulted in additional attorney fees, fees that are ultimately bourne by HEI. The Court reserves the right to take this finding into consideration at the remedy stage, if necessary.[4]

The litigation strategy adopted by the Scott Henry Defendant's is a complete contradiction of their previous acknowledgment of the debt. Their main goal at this point appears to be (1) to retain some shares in HEI and (2) to negotiate a buyout from HEI of the winery and vineyard. Despite decades of treating HEI as his personal ATM machine, and despite apparently never paying rent for utilizing HEI's most valuable property, Scott Henry and Synthia Beavers are amazed, and even personally hurt, that other shareholders challenged Scott's ability to do as he pleased with the corporation he worked so hard for.

But Scott Henry's work was not purely of a charitable fashion. The evidence establishes that Scott routinely paid himself whatever he wanted, without asking other shareholders for

---

[4] As the Court noted in denying the Scott Henry Defendants' motion to sever on the eve of trial, the buyout statute confers considerable discretion on the Court in fashioning an equitable solution. And "if equity requires," the Court may alter voting or other corporate rights. ORS 60.952(e). The Court may also award damages "to any aggrieved party." ORS 60.952(2)(j). For this reason, the Court views the Defendants' internal disputes about whether the Court can enter a judgment against any Defendant in an individual capacity essentially irrelevant to the task at hand. In constructing an equitable buyout, the Court remains free to consider the actions of any shareholder in determining how the parties arrived here and how that should impact the buyout, if at all. Those questions, however, are for another day.

6 – OPINION AND ORDER

approval or even notifying them he had paid himself. Not content with receiving a free life estate of a home on HEI land, Scott used HEI funds for personal expenses such as housekeeping, utilities, and dogsitting services. Evidence at trial indicated other shareholders learned after the fact that Scott Henry used HEI funds to pay for the winery's propane. In 2013, the board finally removed Scott after he kept unilaterally signing HEI checks to himself despite previous resolutions requiring two signatures for any HEI checks. One of these checks, signed only by Scott Henry after the board passed the resolution requiring two signatures for HEI checks, was for nearly $100,000. ECF No. 200, Tr. 32. The Court finds Scott Henry felt he alone controlled HEI and, despite any board resolutions, believed that he could use HEI funds or property at his sole discretion for his own benefit.

Given all of this, the Scott Henry Defendants' strategy is puzzling. Despite the uncontroverted evidence that Scott looted HEI's coffers whenever he saw fit, the Scott Henry Defendants now argue that HEI, and the non-Scott Henry Defendants are merely trying to take advantage of Scott's dementia as a means to steal Scott's shares in HEI. Scott Henry Brief, ECF No. 207, 5. The Scott Henry Defendants argue:

> At the outset of this litigation, HEI opposed Plaintiffs and sought the statutory buy-out. Clear "battle lines" were drawn. Yet, by the time of Trial, the conflict between Plaintiffs and HEI was largely abandoned, and instead HEI (together with Defendants Kearney, Henry and Kruse) sought to use this action as a means to force Scott Henry to give up *all* ownership in HEI. To that end, taking great pains to carefully label itself as a mere "nominal defendant", HEI asked few questions of Plaintiffs' witnesses, did not at all challenge Plaintiffs' evidence relating to SH Defendants' debts, and was most vigorous in its cross-examination of its co-Defendant Synthia Beavers, who has been subject to the Court's stay. This was disorienting, and resulted in absurdities where HEI challenged evidence that actually supported a lower share value.
>
> At Trial, HEI was demonstrably less interested in defending its lower share price (and the case that was purportedly before the Court), and more interested in improving the position of Defendants Kearney, Henry and Kruse vis-à-vis the SH

7 – OPINION AND ORDER

>Defendants. HEI's 180 [degree] reversal coincided with Scott Henry's failing health and HEI's substitution of counsel. Consequently, the premise of a real, live dispute involving parties with a genuine interest in its outcome was not before the Court. Rather, the only non-stayed Defendant (HEI) pursued an alternative agenda, less concerned with carrying out its role in opposing Plaintiffs' advocacy for a high share price, than in pursuing the ploy of the Co-Defendants to better position themselves to take all of Scott Henry's shares, and the winery buildings he built.

Scott Henry Brief, ECF No. 207, 5-6 (footnotes omitted) (emphasis in original).

The Court has a dramatically different view of HEI's role in this litigation. The Scott Henry Defendants view HEI's role as protecting the Scott Henry Defendants over the other HEI shareholders. While wiping out the substantial debt would certainly result in a lower buyout of Plaintiffs' shares, the Scott Henry Defendants appear to not realize that the Passive Defendants would be similarly impacted. The only beneficiaries of the Scott Henry Defendants' strategy are the Scott Henry Defendants.[5] This view, unsurprisingly, mirrors the view Scott Henry held as to HEI's assets over the past 40 years. But HEI has a duty to treat all shareholders equally. This is especially so in an action sounding in equity. The argument also ignores the fact, purposefully or not, that Plaintiffs are current shareholders in HEI. But seeing arguments like these merely confirms for the Court why this litigation is ongoing nearly a decade after being filed, despite the Scott Henry Defendants' acknowledgment of the debt at issue and Mr. Gadawski's appraisal of HEI's undisputed assets. Having seen the full tab Scott Henry ran up, Scott Henry and Synthia Beavers are reluctant to be called to finally settle up.

---

[5] In fact, the Scott Henry Defendants even go so far as to argue that most of the debt went not to Scott Henry himself, but to his winery. ECF No. 207, 9. The Scott Henry Defendants argue "this point should not be overlooked, and it does make a difference in terms of the issue of collectability." ECF No. 207, 9. As discussed below, the winery and Scott Henry are one and the same. It makes no difference whether, when Scott Henry unilaterally signed HEI checks, he made them out to himself or to the winery that he alone controlled and benefited from.

8 – OPINION AND ORDER

That Scott Henry will have to pay the debt he ran up on a corporation he controlled is only fair. Scott Henry kept meticulous notes of the debt of the father of Christina Kruse and David Henry. Christina Kruse was 18 or 19 years old when her father passed away. Scott Henry presented Christina Kruse with a spreadsheet outlining $98,936.66 in "advances payable" from HEI to Christina's father. ECF No. 200, Tr. 108. Scott Henry, as the head of HEI, purchased shares Christina Kruse and David Henry would inherit in order to resolve their father's debt. He increased the debt by roughly $10,000, an amount that Christina Kruse assumed was interest. ECF No. 200, Tr. 115. Additionally, HEI (acting through Scott Henry) charged Christina and David administration expenses of over $70,000 to effectuate this transfer. ECF No. 200, 111. Settling her father's debt was not painless for Christina Kruse. "I was in my first year of college. And so this made it pretty tough, because I was no longer eligible for any financial aids or grants. And I didn't—I didn't have the financial means to afford college. So that was hard." ECF No. 200, Tr. 156. Plaintiffs, joined by the Passive Defendants, only seek to treat Scott Henry the way he treated other shareholders. But Scott Henry's debt is not the only disagreement amongst the parties in relation to the fair value of Plaintiff's shares.

The parties disagree on whether a built-in-gains (BIG) discount should be applied and, if so, at what rate. The Court finds Mr. Gadawski's report persuasive and adopts those findings here. The Court also finds Mr. Gadawski's response to the testimony of Plaintiff's expert, Greg Mettler, persuasive. Mr. Mettler opined that if any BIG discount should be applied, it should be at the current 21% tax rate (as opposed to the 34% tax rate in effect in December 2014). Notably, Mr. Mettler cited a report by Shannon Pratt, who Mr. Mettler acknowledged is "a preeminent author." ECF No. 22, 24. Mr. Pratt, however, notes that the asset approach, as was performed here, "assumes a hypothetical sale, not an actual sale." ECF No. 22, 24. Mr. Mettler

9 – OPINION AND ORDER

acknowledges that approach is "correct" and even testified that "I'm not suggesting that the approach [used by Mr. Gadawski] was incorrect." ECF No. 22, 24. Mr. Mettler also testified that he did not disagree with "the fundamental evaluation based on assets" taken by Mr. Gadawski and acknowledged that "the asset sale approach [is] premised on a hypothetical sale of assets." ECF No. 22, 25. Mr. Mettler testified:

> Well, what happens, Counsel, is that a business appraiser, when they have a valuation date, is valuing it as of a specific date based upon all the information that they know at that time. *And so I'm not suggesting that that approach was not appropriate for a valuation as of December 2014. We could use the hypothetical approach, as Mr. Gadawski did, which is certainly in accordance with the methodology.* But we're now here seven years later, and it seems to me that it would be more appropriate to use the best estimate, meaning the actual numbers that we can, based upon the information that we have currently.

ECF No. 22, 25-26.

Numerous professional societies and organizations adopt a definition of "fair market value" that provides: "The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller . . . ." Supp. Report 2-3. The Court agrees with Mr. Gadowski, who notes "Mr. Mettler's definition of Fair Market Value conspicuously omits the word 'hypothetical' which is present in both the IRS and industry-accepted definitions. The concept of 'hypothetical' transactions is fundamental to the appraisal process." Supp. Report 3. The Court finds that when using an Asset Approach, as was proper here, the BIG discount applies and, because that approach assumes "a hypothetical sale of the asset on the day of the valuation," Mr. Gadowski's use of the 34% BIG discount is consistent with industry standards and appropriate in evaluating the fair value of Plaintiff's shares as of December 2014.[6]

---

[6] Again, Mr. Mettler testified that Mr. Gadowski's approach "is certainly in accordance with the methodology." ECF No. 22, 25-26.

Further, using the current tax rate of 21%, as argued by Mr. Mettler, in addition to going against industry standards, is inconsistent with the Court's reading of the statute. Under the statute, the Court determines the fair value of the shares as of the day before the Plaintiff filed the derivative action. ORS 60.952(6)(f). Using Mr. Mettler's approach may well better track reality, but it would not track the statute. If the statute intended courts to take the reality of the value of shares at the time of the purchase into account, it would not explicitly limit the value to the day before Plaintiffs brought the claim. In addition to finding the BIG tax as of the date of the valuation aligning with standard industry practices, the Court also finds this approach best aligns with the statute itself. The Court finds Mr. Gadowski's April 21, 2021 valuation report is an accurate valuation of the value of HEI shares as of December 11, 2014 and adopts the findings and conclusions in that report as the Court's own. The Court therefore finds the value of Plaintiff's shares, outside of the disputed issues, were $640,466.

As for the amount of Scott Henry's debt, as outlined above, the Court finds Scott Henry's outstanding debt to HEI to be $1,447,172 in principal and $178,210 in interest as of 2014. The Court adopts the findings in this regard of Amy Mauss, CPA, who provided credible testimony regarding how she tabulated the debt and arrived at an appropriate rate of interest. Additionally, the Court notes the above amounts are consistent with HEI's tax returns from 2014 on and undisputed by Synthia Beavers.

The parties disagree as to who owns the winery and vineyard. The Court finds that Scott Henry built the winery and vineyard on HEI's most valuable land for his own benefit as opposed to any benefit to HEI. Although Synthia Beavers may have been listed as a secretary of the

winery, she testified Scott Henry has been the sole officer of the winery since its inception (until after the relevant time period at issue here). ECF No. 201, Tr. 120. There is no indication the winery has any bylaws or kept any minutes. Synthia Beavers is unaware if any minutes exist authorizing any actions taken by the winery. Scott Henry acted as the manager of the winery and was in charge of its day-to-day operations. The Court finds that for the purpose of the debt at issue, Scott Henry and the winery are one and the same.

The winery never paid rent to HEI and there is no evidence of any signed lease between the winery and HEI. HEI pays the property taxes on the Shambrook property, which includes the winery. ECF No. 201, Tr. 138. Despite this, and despite the accepted fact that HEI owns Shambrook, Synthia Beavers believes that Scott Henry's Winery Corp. owns the winery. ECF No. 201, Tr. 137. While the Court understands that the goal of this litigation, at least as to the Scott Henry Defendants, is to redeem shares in exchange for "buying some of the land" the winery sits on, ECF No. 201, Tr. 143, there is no legal basis for concluding the improvements made to winery, or the vineyard itself, are not owned by HEI. In fact, Oregon law is clear that "in the absence of an agreement to the contrary, improvements made by a tenant to property become the property of the landlord upon termination." *Gourley v. O'Donnell*, 51 Or. App. 477, 484 (1981); *Lilenquiest v. Pitchford's Inc.*, 269 Or. 339, 344 (1974).

Here, not only was there no lease, the Scott Henry Defendants do not appear to have paid any rent over the past four decades (and certainly none in the six years before 2014 or in the period between 2014 and the 2022 bench trial). Instead, Scott Henry decided long ago that HEI's most valuable land would make a great spot for his personal winery. After unilaterally reaching that decision, Scott Henry constructed the winery (without bothering to draft a lease) and then ran it for his own benefit. It is clear that HEI owns not only the land on which the winery sits, but

12 – OPINION AND ORDER

all improvements made by the Scott Henry Defendants over the years. These improvements come to $285,587 as of 2014 and are subject to the BIG discount of 34%. Of this amount, $152,508 must be credited to the Scott Henry Defendants. As that is the assessed fair value of the winery structures, equity demands the Scott Henry Defendants are credited with those improvements simply to prevent HEI from double dipping by collecting both the outstanding debt along with improvements Scott Henry made to HEI's property. The parties appear to largely agree that any value from improvements should be credited to the Scott Henry Defendants.

As noted, no evidence indicated the Scott Henry Defendants ever paid any rent to HEI. The only credible testimony at trial as to the fair market value of rent for the winery came from Mr. Moore, who testified that fair rental value was $105,000 per year. Synthia Beavers submitted a declaration following trial regarding her opinion as to similar land. However, the Court finds that evidence not nearly as persuasive or credible as the opinion of Mr. Moore. The Court adopts Mr. Moore's opinion that fair market rent for 49.7 acres of vineyard and winery land as of December 2014 was $105,000 per year for a total fair rent value from the six years before that date to be $630,000. By utilizing HEI's most valuable land for his own benefit for nearly four decades, Scott Henry clearly breached his fiduciary duties to HEI and the other shareholders and he is liable to HEI for the fair value of back rent up to the six-year statute of limitation.

The Court understands the Scott Henry Defendants feel that a fair market rental value of $105,000 per year is manifestly unjust. The Court suspects that this is one issue that led the Scott Henry Defendants to essentially dig in their heels, forcing this litigation to drag on for nearly one decade. Rather than settle up with such a large (but fair) assessment, the Scott Henry Defendants appear to have decided to drive up the cost of this litigation in the hope doing so would persuade the other parties to allow the Scott Henry Defendants to keep the vineyard and winery as a

13 – OPINION AND ORDER

condition of settlement. While the Court refrains at this time from making this express finding, it reserves the right to consider this issue at the remedy stage if necessary. Additionally, the Court reserves the right to consider the Scott Henry Defendants' general litigation stance and strategy when considering what Plaintiffs are entitled to in attorney fees and, correspondingly, who should be on the hook for such fees. As with everything else in this litigation, the end result will be driven largely by what is equitable.[7]

Regarding prejudgment interest, the Court finds that Plaintiffs are entitled to 5% prejudgment interest as of 2014. Not applying prejudgment interest would be inequitable and would only incentivize majority shareholders from stringing along fair valuation cases as long as possible. Finding against prejudgment interest would effectively provide the majority shareholders with an interest free loan at the expense of minority shareholders. The Court is charging interest on Scott Henry's debt and sees no reason why Plaintiffs should not be treated in a similar fashion with respect to the fair value of their shares as of 2014. Additionally, David Henry paid 5% interest on his promissory note to HEI.

Finally, HEI and the Passive Defendants urge this Court to settle all of the Scott Henry Defendants debts as part of the fair value assessment. For instance, they ask the Court to conclude that the interest on Scott Henry's debt from December 2014 to 2022 is nearly $300,000. They also ask the Court that before ordering HEI to buyout Plaintiffs' shares, the Court should first ensure that the Scott Henry Defendants actually settle up their debts.

---

[7] On this issue, the Court acknowledges that the Scott Henry Defendants argue that if the Court allows briefings on attorney fees, "the Court will learn that the primary reason the action did not timely settle was because of the position of co-Defendants vis-à-vis the [Scott Henry] Defendants." ECF No. 207, 18. To be sure, this would be relevant to the Court's determination regarding any attorney fees. That said, if it turns out the Passive Defendants simply wanted Scott Henry to pay his debts to HEI, this argument from the Scott Henry Defendants will likely fall on deaf ears.

14 – OPINION AND ORDER

Otherwise, the Passive Defendants argue Plaintiffs may be unjustly enriched by being bought out when HEI will not actually collect on the debts. These Defendants argue the Scott Henry Defendants threaten ongoing appeals and additional litigation (in addition to the litigation already filed in state court). The Court concludes that these arguments go beyond the scope of the fair value determination presently before the Court. The Court is merely tasked with formulating the fair value of Plaintiffs' shares as of the day before they filed this action. Additionally, the Court is tasked with ensuring an equitable buyout of those shares. While that is the limit of the Court's duties, as this case sounds in equity, the Court may consider any actions, by any parties, in considering the appropriate remedy when buying out Plaintiffs' shares. As the Court previously warned the parties, one such remedy is the ultimate dissolution and sale of HEI.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

15 – OPINION AND ORDER

These findings and conclusions give the parties ample opportunity to determine the fair value of Plaintiffs' shares. As noted at trial, the Court stays any remedy or buyout for 90 days while the parties work toward an acceptable route forward. This route should include reasonable attorney fees.[8] Given the history of this litigation, it is clear to the Court that any agreement will likely be one in which no party is truly satisfied. All parties will have to give and take to reach an acceptable outcome. However, if the parties remain unable to come to an agreement on the buyout, the Court will step in and, as noted at trial, use a much blunter instrument in crafting an appropriate remedy. This matter is stayed for 90 days. At that time, the parties shall file a joint status report.

IT IS SO ORDERED.

DATED this 15th day of June, 2022.

_____/s/ Michael McShane_____
Michael J. McShane
United States District Judge

---

[8] The fees of course must be reasonable. This means the attorney fees are appropriate for any issues on which Plaintiffs prevailed. Reasonable fees, however, do not include fees spent on unsuccessful arguments. Such arguments would include arguments made at the appellate level and district level on whether this action is in fact subject to the buyout provision. Additionally, the Court expressly rejected Plaintiffs' arguments regarding the BIG discount. If the Court is forced to resolve this issue, all parties are placed on notice that a party's general reasonableness will be a driving force when determining (1) what fees are owed and (2) who should pay those fees.

16 – OPINION AND ORDER